IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| TONYA ANN HUNTER, | ). | Case No. 3:24-cv-00157 |
| | ). | |
| Plaintiff, | ). | JUDGE JAMES R. KNEPP II |
| | ). | |
| v. | ). | MAGISTRATE JUDGE |
| | ). | REUBEN J. SHEPERD |
| COMISSIONER OF SOCIAL SECURITY, | ). | |
| | ). | **REPORT AND RECOMMENDATION** |
| Defendant. | ). | |

## I.    Introduction

Plaintiff, Tonya Ann Hunter ("Hunter"), seeks judicial review of the final decision of the

Commissioner of Social Security denying her application for Disability Insurance Benefits

("DIB") under Title II of the Social Security Act. Hunter raises three issues on review of the

Administrative Law Judge's ("ALJ") decision, arguing that:

> 1.    The ALJ erred when her Residual Functional Capacity (RFC) failed to include the fact that the Plaintiff was unable to leave her house;
>
> 2.    The ALJ erred at Step Three of the Sequential Evaluation when she failed to find that Plaintiff was disabled; and,
>
> 3.    The ALJ erred and her decision was not supported by substantial evidence when she failed to properly evaluate the opinions of the treating source in accordance with 20 CFR 404.1520c.

(ECF Doc. 8, p. 1).

This matter is before me pursuant to 42 U.S.C. §§ 405(g), 1383(c)(3) and Local Rule

72.2(b). Because the ALJ applied proper legal standards and reached a decision supported by

substantial evidence, I recommend the Commissioner's final decision denying Hunter's application for DIB be affirmed.

## II.        Procedural History

On May 5, 2022, Hunter filed an application for DIB alleging her disability began March 30, 2019. (Tr. 189-197). She claimed disability due to general anxiety, bipolar disorder I, and depression with psychotic features. (Tr. 96). The claims were denied initially and on reconsideration. (Tr. 93, 104). She then requested a hearing before an ALJ. (Tr.113-14). Hunter and a vocational expert ("VE"). testified before the ALJ on December 16, 2022. (Tr. 37-68).

On February 9, 2023, the ALJ issued a written decision finding Hunter not disabled. (Tr. 14-36). The Appeals Council denied her request for review on November 30, 2023, thereby rendering the ALJ's decision the final decision of the Commissioner. (Tr. 1-5). Hunter timely instituted this action on January 26, 2024. (ECF Doc. 1).

## III.       Evidence

### A.        Personal, Educational and Vocational Evidence

Hunter was 50 years old on the date her application was filed. (Tr. 34). She is a high school graduate, although she did require an Individualized Education Plan. (Tr. 30, 280). Her past relevant work includes employment as a Home Attendant (DOT Code 355.377-014) and as a State Tested Nurse Assistant (DOT Code 355.674-014). (Tr. 30).

### B.        Relevant Educational and Medical Evidence[1]

The record reflects that on October 5, 2018, Hunter visited Noms Healthcare to re-establish herself as a patient. She reported that she had worsening anxiety symptoms, and that the

---

[1] As plaintiff raises only legal issues that pertain to her mental impairments, this discussion will be similarly limited. Any arguments concerning her physical impairments are deemed waived. See, *Kuhn v. Washtenaw Cnty.,* 709 F.3d 612, 624 (6th Cir. 2013).

Paxil she had been taking was no longer helpful. (Tr. 403). At a subsequent visit on October 24, 2018, Hunter was assessed with a current moderate episode of major depressive disorder without prior episode. (Tr. 401).

Hunter was admitted to the hospital for 8 days beginning on November 11, 2018, following an intentional overdose on her mental health medications. (Tr. 290). During her stay, she reported that she had been feeling depressed and anxious for about six weeks preceding the suicide attempt. (*Id.*). Examination notes indicated that she was talking in a slow, monotonous tone; that she had flat affect and retarded psychomotor activity and poverty of thought. (Tr. 300). She also displayed low self-esteem, helplessness, hopelessness, and suicidal ideations. (*Id.*). At release she was diagnosed with bipolar disorder, depressed episode. (Tr. 303).

Hunter met with Felicia Fior-Nossek, APRN-CNS on December 11, 2018, and reported that she was no longer depressed, and that she had "a bunch of energy" and could not sit still. (Tr. 313). She further reported binge eating, overthinking, and excessive worry. (*Id.*). She endorsed a history of manic and depressive episodes, as well as social phobia, paranoia, and anxiety around others. (*Id.*). Ms. Fior-Nossek diagnosed her with bipolar I disorder and generalized anxiety disorder. (*Id.*). At an appointment with Ms. Fior-Nossek on January 10, 2019, Hunter reported that her depression, anger, and irritability were "under control," while her anxiety was "fair." (Tr. 315). She was still feeling "a little hyper" but that had improved from the previous visit. (*Id.*). When asked about stressors in her life, Hunter responded "I feel pretty good. I can actually handle it." (*Id.*).

At a medication management visit on April 18, 2019, Hunter described her depression, anxiety, anger, and irritability symptoms as "fair." (Tr. 318). She was grieving the recent death of her son by heroin overdose. (*Id.*). By April 29, 2019, she was involved in grief counseling but

reported feeling anxious "and a little spacey." (Tr. 329). At her next medication management session on July 30, 2019, Hunter felt her depression, anger and irritability were "under control," though her anxiety symptoms remained only fair. (Tr. 321). She noted low energy, depressed mood, sadness and tearfulness. (*Id.*).

Hunter participated in a tele-visit for medication management on July 20, 2020, and denied both depression and anxiety, or any psychosocial stressors. (Tr. 341). On November 11, 2020, Hunter reported that her mood was not depressed, she denied anxiety, and she stated, "I think the medication is working." (Tr. 344). On February 11, 2021, Hunter again reported that she was not depressed and that her anxiety was "under control." (Tr. 347). At a May 10, 2021 appointment, Hunter described her anxiety as "bothersome," but reported that she had been working part-time, 4-5 hours per day. (Tr. 350). As of her August 11, 2021 appointment, her anxiety had increased to an 8-9/10, and she was anxious to go to the store, but was managing to get through it. (Tr. 354).

At a telephone appointment for medication management on March 9, 2022, Hunter reported that she became very anxious if she had somewhere to go. (Tr. 365). There was discussion of adjustment to her medication, and Hunter noted some improvement. (*Id.*). On April 4, 2022, Hunter described herself as more sad than depressed, noting that it was the anniversary of her son's death that month. (*Id.*). She had been too anxious to go to Wal-Mart. (Tr. 361). At a May 19, 2022 appointment, Hunter stated that another friend of hers had died, and she was more sad than depressed. (Tr. 357). She was too anxious to shop in big box stores alone. (*Id.*). She stated her anxiety symptoms were fair on July 6, 2022. (Tr. 444).

Hunter was referred for therapy, and had an initial counseling session with Jacqueline Spadaro, LPCCS, on August 16, 2022. (Tr. 511). There, Hunter described her unresolved grief

4

from losing two sons to overdose, and unresolved questions about why her father left home when she was six years old. (*Id.*). She had to drive to visit her surviving daughter and grandchildren, which caused her great anxiety. (*Id.*). She was unable to work as a Home Health Aide or go into stores when people were present. (*Id.*). She was married to her second husband, after surviving an abusive marriage. (*Id.*). Her first husband still resided with her daughter. (*Id.*). Hunter reported overthinking and low motivation and energy. (*Id.*). She was always tired and had to rely on her husband for all household chores. (*Id.*). She sometimes cried uncontrollably. (*Id.*). She did not like to leave home and preferred tele-visits. (*Id.*). The next day, at a medication management appointment, she rated her anxiety "terrible." (Tr. 507).

On August 29, 2022, Hunter told her therapist she was having racing thoughts and insomnia, and had only left home three times in the past week. (Tr. 505). At a September 12, 2022 therapy session, Hunter reported that her grandmother, who was like a mother to her, had passed away. (Tr. 503). She had also attended an Opioid Awareness celebration for her children and was proud of herself for staying ten minutes. (*Id.*). As of September 26, 2022, she was continuing to grieve her grandmother's death, and noted she can only go out in public if accompanied by her husband or daughter-in-law. (Tr. 501). On October 13, 2022, she reported that she had not showered in a week due to her grief relating to her son's death. (Tr. 499). At a November 1, 2022 therapy tele-visit, Hunter described her anxiety as manageable. Hunter told her therapist she would be attending her granddaughter's birthday party, and she would soon begin babysitting her three days per week. Her depression symptoms had improved, and she was contemplating going shopping. (Tr. 494).

### C.     Medical Opinion Evidence

#### i.     State Agency Reviewers

On June 18, 2022, state agency reviewing psychologist Irma Johnston, Psy.D. found that Hunter had moderate limitations in interacting with others and in concentration, persistence, and maintaining pace. (Tr. 74). Dr. Johnston also determined she had mild limitations in understanding, remembering, and applying information, and in adapting or managing oneself. (*Id.*). Dr. Johnston opined that Hunter had moderate limitation in her ability to maintain attention and concentration for extended periods; to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; and, to interact appropriately with the general public. (Tr. 75). At the reconsideration level, on July 30, 2022, state agency reviewing physician Ermias Seleshi, M.D. adopted the findings of Dr. Johnston. (Tr. 83).

#### ii.     Treating Source Opinions

On July 6, 2022, treating source Felicia Fior-Nossek, APRN-CNS, submitted a response to a Mental Health Questionnaire. (Tr. 428-29). Ms. Fior-Nossek listed diagnoses of generalized anxiety and bipolar disorder, and prescribed medications Latuda, Lamictal, Zoloft, and Trazodone. (Tr. 428). Under clinical findings, Ms. Fior-Nossek wrote that "severe anxiety impairs ability to go outside house." (*Id.*). The prognosis was "fair with med compliance. Would be good if participated in counseling/medications." (*Id.*).

Ms. Fior-Nossek opined that Hunter was unable to meet competitive standards with regard to managing regular attendance and being punctual within customary tolerances; working in coordination with or in proximity to others without being distracted by them; completing a normal workday and workweek without interruptions from psychologically based symptoms;

6

performing at a consistent pace without an unreasonable number and length of rest periods; understanding and remembering short and simple instructions; understanding and remembering detailed instructions; accepting instructions and responding appropriately to criticism from supervisors; and, getting along with coworkers or peers without distracting them or exhibiting behavior extremes. (Tr. 428-29).

Ms. Fior-Nossek further opined that Hunter was seriously limited but not precluded from carrying out detailed instructions; maintaining attention and concentration for extended periods; performing activities within a schedule; sustaining an ordinary routine without special supervision; remembering locations and work-like procedures; interacting appropriately with the general public; responding appropriately to changes in the work setting; and, setting realistic goals or making plans independently of others. (*Id.*). Ms. Fior-Nossek suggested Hunter was limited but satisfactory in carrying out very short and simple instructions; asking simple questions or requesting assistance; maintaining socially appropriate behaviors and adhering to basic standards of neatness and cleanliness; and being aware of normal hazards and taking appropriate precautions. (*Id.*). Ms. Fior-Nossek felt Hunter would be absent from work five days per week because she was unable to leave her house to go to public places. (*Id.*). She would be off-task from performing job tasks 50% of the time. (*Id.*).

Ms. Fior-Nossek submitted a Mental Health Residual Functional Capacity Assessment on August 17, 2022 that was generally consistent with Mental Health Questionnaire. (Tr. 448-50). Here, Ms. Fior-Nossek wrote, "Patient suffers from severe anxiety, which has made it difficult to go outside of home without significant distress. Has difficulty with focusing on tasks and completion. Becomes agitated around new people. Has difficulty with insomnia. History of manic episodes with hospitalization." (Tr. 450).

### D.     Administrative Hearing Evidence

On December 16, 2022, Hunter testified before the ALJ that she believed she began receiving mental health treatment in 2018, first with her primary care doctor, Dr. Bower, then with Ms. Fior-Nossek. (Tr. 42.). Dr. Bower had prescribed her mediation for depression and anxiety. (Tr. 42-43). Once Hunter started seeing Ms. Fior-Nossek her medications were changed. (Tr. 43). In the past year, Hunter had been seeing Ms. Fior-Nossek about every month to six weeks. (Tr. 44). Hunter also started counseling and was attending about every three to four weeks. (Tr. 45).

When asked about her depression symptoms, Hunter testified that she cannot sleep some nights and that she gets bad anxiety. (Tr. 46). She cannot concentrate, and she is exhausted. (*Id.*). She also reported back pain and headaches. *(Id.*). When asked about anxiety symptoms, she mentioned panic attacks and feeling like she cannot breathe. (*Id.*). She also experiences stomach pains and excessive use of the restroom. (*Id.*). She testified that her panic is triggered by having to go somewhere alone, or by being around strangers. (*Id.*). She also testified that she does not like change, and she requires repetition in order to do anything. (Tr. 47).

Hunter testified that she had been delusional in 2018, and that she would hear things that were not there. (Tr. 46-47). She described looking through her husband's email and deleting items from her phone because she believed someone was listening to her. (Tr. 47). The delusions only ended once she was hospitalized and put on medication. (*Id.*). Hunter also testified that she struggles with grief. (Tr. 49). In addition to helping manage her delusions, Hunter felt her

medication helped her with her motivation, and some days helps her to even take a shower. (Tr. 50-51).

Hunter added that she is okay with being home alone, but the panic attacks will happen when she leaves home. (Tr. 52). She felt she had more bad days than good, which she attributed to grief and depression. (*Id.*). Hunter had been journaling as one strategy to deal with her depression. (Tr. 53). She felt her back pain and headaches were symptoms of her anxiety and stress. (Tr. 54). She has days she cannot get out of bed or take a shower. (*Id.*).

Hunter testified that Ms. Fior-Nossek feels like she cannot work because she is not stable, she cannot be around new people, she cannot manage change, and she needs to use the restroom excessively. (Tr. 54-55). Hunter then described her past work as a caregiver for MRDD patients and as a state-tested nursing assistant, noting that she stopped working in 2019. (Tr. 55-56). She had stopped working because she could not maintain concentration and was unable to complete tasks. (Tr. 56-57).

Hunter testified that she had cried three different days the week of the hearing, often relating to her grief. (Tr. 57). She continues to have her appointments with her counselor by tele-medicine. (Tr. 58). She often does not remember what she has seen while watching television. (*Id.*). She does not read because she has difficulty with comprehension. (*Id.*). Her side effects from her medications include dry mouth, headaches, fatigue, shakiness, clumsiness, and lightheadedness. Despite her fatigue, she has difficulty staying asleep. (Tr. 58-59). She sometimes takes two naps per day. (Tr. 59). Despite her hospitalization in 2018, she continued working until 2019 when her youngest son passed away. (Tr. 60).

Hunter testified that every day of the week of the hearing had been a "bad day." (*Id.*). She added that her husband had to do all of the household chores because she was unable to maintain

the concentration to complete those tasks. (*Id.*). She testified that her symptoms had improved, but "not all the way to the top." (*Id.*). She still feels she would be unable to return to work due to her inability to leave her house. (Tr. 60-61).

Following Hunter's testimony, VE Paula Zinsmeister testified. The VE classified Hunter's past relevant work to include Home Attendant, DOT 354.377-014, with a specific vocational preparation level ("SVP") of 3, and a physical demand level of medium, though Hunter performed it at the light level. (Tr. 62). Hunter had also worked as a Nurse Aide, DOT 355.674-014, SVP 4, with a physical demand level of medium, performed at light. (*Id.*).

The ALJ then proceeded to posing hypotheticals. For her first hypothetical, the ALJ asked the VE to consider a younger individual with a high school education, capable of performing medium work, and capable of performing all other postural activities on a frequent basis. The individual could perform no assembly line work dictated by an external source, no work with dangerous machinery, and no commercial driving. (Tr. 63). The individual could understand, remember, and carry out simple instructions that require little or no judgment and a short period of time to learn. (*Id.*). The individual could have occasional interaction with the public, coworkers, and supervisors. *(Id.).* The VE opined there were jobs in the national economy such an individual could perform and offered examples of jobs that were all at a medium exertional level and unskilled with SVP's of 2, including linen room attendant, with a DOT code of 222.387-020, with approximately 6,000 positions in the national economy; cook helper, DOT 317.687-010, with approximately 30,000 positions; and, laundry worker, II, DOT 361.685-018, with approximately 4,000 positions in the national economy. (Tr. 63-64).

The VE's second hypothetical was the same as the first, except here, the individual would have no public interactions. (Tr. 64). Here, the VE opined that the individual would be capable of

performing the same jobs, with the same number of positions in the national economy, as the individual in the first hypothetical. (Tr. 64). For her third hypothetical, the ALJ further reduced the residual functional capacity to allow no interactions with coworkers. (*Id.*). As this added restriction would require an accommodation from an employer, the VE opined that this hypothetical would preclude all competitive employment. (Tr. 64-65). The VE testified as to standard breaks and that, in her opinion, if an employee was off-task 15% of the time or more, that would be work preclusive. (Tr. 65). The VE further opined that if an employee is absent more than once per month on an ongoing basis, that too would typically be work preclusive. (*Id.*).

Hunter's counsel offered a hypothetical where an individual would be unable to leave her room at least twice weekly, which the VE also found work preclusive. (Tr. 66). Counsel then asked if the individual would need to be accompanied by a family member to leave the house, would that preclude all work? (*Id.*). The VE was unable to opine on that hypothetical. (Tr. 66-67). Counsel asked the VE if the individual, due to memory and focus problems, would need to be reminded of their job duties by a supervisor twice daily on an ongoing basis, could they perform any jobs? (Tr. 67). The VE opined that this was work preclusive. (*Id.*). Finally, counsel inquired if an individual required two additional 15-minute breaks per work day, would that be work preclusive? (*Id.*). The VE opined that it was. (*Id.*).

## IV.     The ALJ's Decision

In her decision dated February 14, 2023, the ALJ made the following findings:

1.     The claimant meets the insured status requirements of the Social Security Act through March 31, 2024.

2.     The claimant has not engaged in substantial gainful activity since November 11, 2018, the alleged onset date (20 CFR 404.157171 *et seq*).

3.      The claimant has the following severe impairments: bipolar depression and generalized anxiety disorder (20 CFR 404.1520(c).).

4.      The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d)., 404.1525 and 404.1526).

5.      After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform medium work as defined in 20 CFR 404.1567(c). except: engaging in the remaining postural activities on a frequent basis working in environments with no assembly line production dictated by an external source, no dangerous machinery, no commercial driving and occasional interaction with the public, co-workers and supervisors. In addition, the claimant can understand and remember simple instructions that require little or no judgment and a short period of time to learn.

6.      The claimant in unable to perform any past relevant work (20 CFR 404.1565).

7.      The claimant was born on August 25, 1971 and was 47 years old, which is defined as younger individual age 18-49, on the alleged disability onset date. The claimant subsequently changed age category to closely approaching advanced age. (20 CFR 404.1563).

8.      The claimant has at least a high school education (20 CFR 404.1564).

9.      Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.     Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569 and 404.1569a).

11.     The claimant has not been under a disability, as defined in the Social Security Act, since November 11, 2018, through the date of this decision (20 CFR 404.1520(g).).

(Tr. 14-40).

## V.        Law and Analysis

### A.        Standard for Disability

Social Security regulations outline a five-step process the ALJ must use to determine whether a claimant is entitled to benefits:

1.      whether the claimant is engaged in substantial gainful activity;

2.      if not, whether the claimant has a severe impairment or combination of impairments;

3.      if so, whether that impairment, or combination of impairments, meets or equals any of the listings in 20 C.F.R. Part 404, Subpart P, Appendix 1;

4.      if not, whether the claimant can perform their past relevant work in light of his RFC; and

5.      if not, whether, based on the claimant's age, education, and work experience, they can perform other work found in the national economy.

20 C.F.R. § 404.1520(a).(4).(i).-(v)[2]; *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 642-43 (6th Cir. 2006). The Commissioner is obligated to produce evidence at Step Five, but the claimant bears the ultimate burden to produce sufficient evidence to prove they are disabled and, thus, entitled to benefits. 20 C.F.R. § 404.1512(a).

### B.  Standard of Review

This Court reviews the Commissioner's final decision to determine if it is supported by substantial evidence and whether proper legal standards were applied. 42 U.S.C. § 405(g); *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007). However, the substantial evidence standard is not a high threshold for sufficiency. *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019). "It means – and means only – 'such relevant evidence as a reasonable mind might

---

[2] The regulations governing DIB claims are found in 20 C.F.R. § 404, *et seq.* and the regulations governing SSI claims are found in 20 C.F.R. § 416, *et seq.*  Generally, these regulations are duplicates and establish the same analytical framework.  For ease of analysis, I will cite only to the relevant regulations in 20 C.F.R. § 404, *et seq.* unless there is a relevant difference in the regulations.

accept as adequate to support a conclusion.'" *Id.*, quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938). Even if a preponderance of the evidence supports the claimant's position, the Commissioner's decision cannot be overturned "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

Under this standard, the court cannot decide the facts anew, evaluate credibility, or re-weigh the evidence. *Id.* at 476. And "it is not necessary that this court agree with the Commissioner's finding," so long as it meets the substantial evidence standard. *Rogers*, 486 F.3d at 241; *see also Biestek*, 880 F.3d at 783. This is so because the Commissioner enjoys a "zone of choice" within which to decide cases without court interference. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986).

Even if substantial evidence supported the ALJ's decision, the court will not uphold that decision when the Commissioner failed to apply proper legal standards, unless the legal error was harmless. *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("[A] decision . . . will not be upheld [when] the SSA fails to follow its own regulations and that error prejudices a claimant on the merits or deprives the claimant of a substantial right."); *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 654 (6th Cir. 2009) ("Generally, . . . we review decisions of administrative agencies for harmless error."). Furthermore, this Court will not uphold a decision when the Commissioner's reasoning does "not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011). Requiring an accurate and logical bridge ensures that a claimant and the reviewing court will understand the ALJ's reasoning, because "[i]f relevant evidence is not mentioned, the

court cannot determine if it was discounted or merely overlooked." *Shrader v. Astrue*, No. 11-13000, 2012 WL 5383120, at *6 (E.D. Mich. Nov. 1, 2012).

## VI.        Discussion

Hunter brings three issues for this Court's review:

1.   Whether the ALJ erred when her Residual Functional Capacity (RFC) failed to include the fact that Plaintiff was unable to leave her house alone.

2.   Whether the ALJ erred at Step Three of the Sequential Evaluation when she failed to find that Plaintiff was disabled.

3.   Whether the ALJ and her decision was not supported by substantial evidence when she failed to properly evaluate the opinions of the treating source in accordance with 20 CFR 404.1520(c).

(ECF Doc. 8, p. 1). I address each in order below. For the reasons that follow, I find no reversible error and recommend the District Court affirm.

### A.        The ALJ did not err in determining that plaintiff was capable of leaving home alone.

Hunter argues that the ALJ erroneously failed to include a limitation in her RFC reflecting her inability to leave home alone. In support of this argument, Hunter cites multiple instances in the record where she expressed uneasiness at leaving home unaccompanied based primarily on anxiety symptoms, and further notes having difficulty with activities such as shopping, attending appointments, or going to work, due, at least in part, to an impaired ability to go outside of her home. (ECF Doc. 8, pp. 8-11). Hunter's husband noted in a third-party function report that she was not functional at times, (Tr. 236) and her memory issues impaired her ability to follow simple instructions. (ECF Doc. 8, p. 10). Hunter cites to Ms. Fior-Nossek's Mental Health Questionnaire, in which she opined that Hunter's impaired ability to leave home would render her incapable of most work functions including managing attendance and punctuality, interacting with others, performing at a consistent pace and understanding and remembering

15

instructions. (*Id.* at p. 9). Ms. Fior-Nossek further opined that Hunter would be absent from work five days per work week. (*Id.*). Another opinion rendered by Ms. Fior-Nossek indicated that Hunter had marked limitations in almost all areas of work functioning. (*Id.*).

In response, the Commissioner argues that the record is replete with evidence of Hunter leaving home successfully to shop and attend mental health appointments. (ECF Doc 10, p. 17). The Commissioner also contends that the ALJ performed an appropriate evaluation of Ms. Fior-Nossek's opinion, and determined it to be unpersuasive, finding it inconsistent with her examination notes, as well as other evidence in the record. (*Id.*). The Commissioner argues that Hunter listed only facts and statements favorable to her position, without accounting for other conflicting evidence, and suggests that this Court should not engage in reweighing of the evidence. (*Id.*, at p. 19).

The RFC is the province of the ALJ, not a specific physician, and the ALJ must formulate the RFC based on all the evidence in the record. *See Coldiron v. Comm'r of Soc. Sec.*, 391 F. App'x 435, 439 (6th Cir. 2010); *Poe v. Comm'r of Soc. Sec.*, 342 F.App'x 149, 157 (6th Cir. 2009) (the ALJ "is not required to recite the medical opinion of a physician verbatim in his [RFC] finding."). An RFC determination is a legal finding, not a medical determination; thus an "ALJ – not a physician – ultimately determines a claimant's RFC." *Coldiron,* 391 F. App'x at 439. In doing so, the ALJ evaluates, rather than interprets, the medical evidence and the claimant's testimony. *Id.*

The ALJ may not make medical judgments in fashioning an RFC. *Meece v. Barnhart,* 192 F. App'x 456, 465 (6th Cir. 2006). But "[a]n ALJ does not improperly assume the role of a medical expert by [merely] weighing the medical and non-medical evidence before rendering an RFC finding." *Id.,* citing *Poe,* 342 F. App'x at 157. Similarly, "[a]lthough the ALJ may not

16

substitute his opinion for that of a physician" in fashioning an RFC, the ALJ is not required to recite the medical opinion of a physician verbatim in his [RFC] finding. *Id.*, citing 20 C.F.R. §404.1545(a)(3). "[T]he regulations make clear that a claimant's RFC is an issue reserved to the Commissioner and the ALJ assesses a claimant's RFC 'based on all of the relevant medical and other evidence of record.'" *Harris v. Comm'r of Soc. Sec.,* No. 1:13-cv-00260, 2014 WL 346287, at *11 (N.D. Ohio, Jan. 30, 2014).

In the present case, it is clear that the ALJ formulated an RFC based on a full and thorough review of all relevant evidence in the record. The ALJ's assessment of the record notes several visits for medication management, including in January 2019 when Hunter described "fair" control over her anxiety symptoms and improvement in managing her depression. (Tr. 25). In April 2019, Hunter described having fair control over her anxiety, depression, and irritability despite significant stressors in her life. (*Id.*). Follow-up appointments in July, September, October, and December of 2019 showed only routine medication refills without significant evidence of decompensation or changes in mood stability. (Tr. 26). Notes from a follow-up examination in July 2020, showed that her mood was essentially normal, with no complaints of depression, anxiety, or psychosis. (*Id.*).

The ALJ notes that Hunter did show some increases in anxiety, which she described as somewhat bothersome in May 2021, but she did display a cooperative demeanor, good impulse control, and good insight. (*Id.*). Hunter had some increasing anxiety, particularly when leaving home, in August 2021. (Tr. 27). In April 2022, Hunter described some increases in anxiety symptoms, stating that she was unable to leave the house to go to the store, but changes in medication had reduced the anxiety symptoms to a "4" on a 10-point scale. (*Id.*). At a July 2022 session, Hunter asked that disability paperwork be completed, and although she was described as

exhibiting marked limitations, her depressive symptoms were described as "under control" and her anxiety symptoms were described as "fair." (*Id.*).

The ALJ also evaluated the opinions of Ms. Fior-Nossek and found them to be unpersuasive. (Tr. 29). The ALJ observed that the opinions of Ms. Fior-Nossek were inconsistent with her own examination notes and other medical records. (*Id.*). The ALJ further noted that Hunter had appeared for medical appointments with stable affect and grossly intact thought processes, which was inconsistent with extreme limitations, such as a restriction from leaving her house. (*Id.*). The ALJ also found Ms. Fior-Nossek's opinion inconsistent with State Agency psychologist opinions which showed only mild to moderate restrictions. (*Id.*).

The analysis of the record shows that the ALJ determined Hunter's RFC thoughtfully and with a full view of all the relevant evidence. The ALJ created an accurate and logical bridge from the medical evidence to the RFC, allowing a reviewing court to follow her reasoning. While the record shows evidence that supports both Hunter's and the Commissioner's view of whether this particular restriction should have been included within the RFC, a reasonable mind can find sufficient evidence to support the ALJ's determination to refrain from its inclusion. Accordingly, the RFC falls within the ALJ's zone of choice and must not be disturbed.

**B.   The ALJ did not err at Step Three of the Sequential Evaluation when she failed to find Hunter disabled.**

At Step Three, a claimant has the burden to show that she has an impairment or combination of impairments that meets or medically equals the criteria of an impairment listed in 20 C.F.R. § 404, Subpart P, Appendix 1. *Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001); 20 C.F.R. § 404.1520(a)(4)(iii). If the claimant meets all of the criteria of a listed impairment, she is disabled; otherwise, the evaluation proceeds to Step Four. 20 C.F.R. § 404.1520(d)-(e); *Bowen v.*

*Yuckert*, 482 U.S. 137, 141 (1987); *see also Rabbers v. Comm'r of SSA*, 582 F.3d 647, 653 (6th Cir. 2009) ("A claimant must satisfy all of the criteria to meet the listing.").

In evaluating whether a claimant meets or equals a listed impairment, an ALJ must "actually evaluate the evidence, compare it to [the relevant listed impairment], and give an explained conclusion, in order to facilitate meaningful judicial review." *Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 416 (6th Cir. 2011) (noting that, without such analysis, it is impossible for a reviewing court to determine whether substantial evidence supported the decision). The ALJ "need not discuss listings that the [claimant] clearly does not meet, especially when the claimant does not raise the listing before the ALJ." *Sheeks v. Comm'r of SSA*, 544 F. App'x 639, 641 (6th Cir. 2013). "If, however, the record raises a substantial question as to whether the claimant could qualify as disabled under a listing, the ALJ should discuss that listing." *Id.* at 641; *see also Reynolds*, 424 F. App'x at 415-16 (holding that the ALJ erred by not conducting any Step Three evaluation of the claimant's physical impairments when the ALJ found that the claimant had the severe impairment of back pain).

"A claimant must do more than point to evidence on which the ALJ could have based his finding to raise a 'substantial question' as to whether he satisfied a listing." *Smith-Johnson v. Comm'r of Soc. Sec.*, 579 F. App'x 426, 432 (6th Cir. 2014) quoting *Sheeks*, 544 F. App'x at 641-42. "Rather, the claimant must point to specific evidence that demonstrates he reasonably could meet or equal every requirement of the listing." *Id.* citing *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990). If, however, substantial evidence supports the ALJ's determination that a claimant does not meet or equal a listing, the Commissioner's decision cannot be overturned. *See Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).  This is so because the Commissioner enjoys a "zone of choice" within which to decide cases without court interference. *Mullen v.*

*Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) In the present case, Hunter offers examples culled from the record that would seem to support her argument that the ALJ should have found her disabled at Step Three of the Sequential Evaluation. In so doing, however, Hunter gives short shrift to the substantial evidence that undergirds the ALJ's determination that she does not establish disability under Listings 12.04 and 12.06. As the sufficiency standard requires only "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion'" the conclusion of the ALJ falls within her zone of choice and must stand. *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019), quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938).

In evaluating whether a claimant meets either Listing 12.04 or 12.06, an ALJ must determine whether the "B" criteria are satisfied. 20 C.F.R. Pt. 404, Subpt. P, App. 1 §§ 12.04, 12.06. The "B" criteria are identical for the two listings in question. To satisfy the "B" criteria for either Listing, a claimant must show that her mental impairments resulted in extreme limitations of one, or marked limitations in two, of the following areas of mental functioning: (1) understanding, remembering or applying information; (2) interacting with others; (3) maintaining concentration, persistence or pace; or, (4) adapting or managing oneself. 20 C.F.R. Pt. 404, Subpt. P, App. 1 §§ 12.04, 12.06. Here, the ALJ concluded Hunter had moderate limitations in understanding, remembering, and applying information; interacting with others; and, maintaining concentration, persistence, and pace. The ALJ found only mild limitations in adapting or managing oneself. (Tr. 20-21).

Hunter argues that she had marked limitations in interacting with others; maintaining concentration, persistence, or pace; and, adapting or managing oneself. As support for her argument that she had marked limitations in interacting with others, she notes that she attended

several of her medical appointments via telehealth, seemingly suggesting that this confirmed she was unable to leave her house. (ECF Doc. 8, p. 13). The Commissioner notes that Hunter's reference to three tele-health visits discounts several other in-person evaluations Hunter attended, as well as the positive nature of Hunter's interactions with medical providers. (ECF Doc. 10, p. 11). I further note references in the treatment records that show Hunter attending other activities outside of the home, including an Opioid Awareness event and her granddaughter's birthday party (Tr. 494; 503). Plaintiff also mentioned feeling anxious when going to stores, but "getting through it." (Tr. 354). While there may be other reasons why one may choose to attend appointments via tele-health beyond fear of leaving home, such as convenience or a global pandemic, even assuming anxiety was a driving factor, that is not sufficient to lead a reasonable mind to conclude that the ALJ's determination ---regarding Hunter's limitation in interacting with others is without support. Accordingly, this argument fails.

With regard to maintaining concentration, persistence and pace, the ALJ based her finding of a moderate limitation on Hunter's abilities to "manage her own medications, use a computer for shopping, drive to appointments, and . . . do some tasks around the home when her husband is away at work." (Tr. 21). The ALJ noted that Hunter "reported that she needs frequent breaks, additional time to complete tasks and reminders to complete even basic activities such as bathing and getting dressed." (*Id.*). Here, as above, Hunter points to specific instances within the record that may suggest some memory issues or decreased concentration as support for her contention that the ALJ lost her way, but in so doing, she fails to account for the many other examples from the record noted above that would comport with the ALJ's assessment. Hunter also cites the opinion of Ms. Fior-Nossek to support marked limitations in this area of consideration. Hunter fails to address the ALJ's analysis of Ms. Fior-Nosseks opinion, which the

ALJ found unpersuasive due to inconsistencies between Ms. Fior-Nossek's opinion and her treatment notes; inconsistencies between the opinion and Dr. Bower's treatment notes; and inconsistencies between Ms. Fior-Nossek's opinion and those of the State Agency experts. (Tr. 29). Clearly there is substantial evidence underlying the ALJ's assessment of Hunter's limitations in concentration, persistence, and pace, and the ALJ's assessment of a moderate limitation therefore lies squarely in the "zone of choice" within which to decide the case without court interference.

Hunter also argues that the ALJ erred in finding a moderate limitation in the domain of adapting or managing oneself. Here, again, Hunter cherry picks examples from the record that could perhaps support her position, noting that she needed reminders to shower, and that she often cried. (ECF Doc. 8, pp. 14-15). She does so, however, without noting that the ALJ expressly addressed issues with self-care and emotional regulation in her decision, while also discussing Hunter's reliance on her husband for cooking, cleaning, and management of household finances. (Tr. 22). The ALJ also considered Hunter's ability to manage her own medications, her ability to function when left home alone, and her ability to tolerate daily stressors without significant decompensation when assessing this domain, and arrived at the conclusion that Hunter's limitations were moderate. (*Id.*). Here, again, a full read of the record shows that there is substantial evidence supporting the ALJ's decision, and this Court must therefore defer to that finding, even if there is substantial evidence in the record that would have supported an opposite conclusion. *See Longworth v. Comm'r of Soc. Sec.,* 402 F.3d 591, 595 (6th

Cir. 2005). Allowing for that deference, Hunter's argument relative to this issue is not well-taken and I accordingly recommend affirming the Commissioner's decision.

      **C.**    **The ALJ's evaluation of the opinion of the treating source was supported by substantial evidence.**

Plaintiff argues that the ALJ improperly evaluated the opinion of the treating source, Ms. Fior-Nossek, as the evaluation was not supported by substantial evidence. The evaluation of medical opinion evidence is governed by 20 C.F.R. § 404.1520c. This regulation mandates that the ALJ "will not defer or give any evidentiary weight, including controlling weight to any medical opinion(s) . . .." 20 C.F.R. § 404.1520c(a). Rather, the ALJ must evaluate each medical opinion's persuasiveness based on its: (1) supportability; (2) consistency; (3) relationship with the plaintiff; (4) specialization; and, (5) "other factors that tend to support or contradict a medical opinion or prior administrative medical finding." 20 C.F.R. § 404.1520c(c); *see also Heather B. v. Comm'r of Soc. Sec.,* 2022 WL 3445856 (S.D. Ohio August 17, 2022). Supportability and consistency are the most important factors; ALJ's must "explain how [they] considered the supportability and consistency factors for a medical source's medical opinions or prior administrative findings in [their] determination or decision." 20 C.F.R. § 404.1520c(b)(2). ALJs "may, but are not required to," consider factors three through five when evaluating medical source opinions. (*Id.*).

For supportability, "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s). . . the more persuasive the medical opinions . . . will be." 20 C.F.R. § 404.1520c(c)(1). For consistency, "[t]he more consistent a medical opinion(s) . . . is with the evidence from other medical sources

and non-medical sources in the claim, the more persuasive the medical opinion(s) . . .. 20 C.F.R. § 404.1520c(c)(2).

An ALJ must "provide a coherent explanation of his [or her] reasoning. *Lester v. Saul*, No. 5:20-cv-01364, 20 WL 8093313 at *14 (N.D. Ohio Dec. 11, 2020), *report and recommendation adopted sub nom., Lester v. Comm'r of Soc. Sec.,* No. 5:20-cv-01364. 2021 WL 119287 (N.D Ohio, Jan. 13, 2021). The ALJ's medical source opinion evaluation must contain a "minimum level of articulation" to "provide sufficient rationale for a reviewing adjudicator or court." *Revisions to Rules Regarding the Evaluation of Medical Evidence,* 2017 WL 168819, 82 Fed. Reg. 5844, 5858 (Jan. 18, 2017). If an ALJ does not "meet these minimum levels of articulation," it "frustrates this [C]ourt's ability to determine whether her disability determination was supported by substantial evidence." *Heather B.,* at *3, *citing Warren I. v. Comm'r of Soc. Sec.,* No. 5:20-cv-495, 2021 WL 860506, at *8 (N.D.N.Y., Mar. 8, 2021).

In the present case, the ALJ provided significant support for her finding that Ms. Fior-Nossek's opinion was unpersuasive. Specifically, the ALJ considered that the claimant had not required emergency room visits or repeated hospitalization for symptoms that Ms. Fior-Nossek had found markedly severe. The ALJ found discrepancies between Ms. Fior-Nossek's finding of marked symptoms and Hunter's presentation at her treating physician's office where she had demonstrated stable affect and intact thought processes. Finally, the ALJ contrasted Ms. Fior-Nossek's findings with that of the State agency psychological experts who found that her limitations ranged from mild to moderate. (Tr. 29). The above indicates that the ALJ considered both the supportability of the opinion and the consistency with other medical opinions, and

24

provided this Court with a sufficient rationale for consideration. As the ALJ met the mandate for medical opinion evaluation, I recommend that this Court leave the ALJ's decision undisturbed.

## VII.     Recommendation

Because the ALJ applied proper legal standards and reached a decision supported by substantial evidence, I recommend that the Commissioner's final decision denying Hunter's application for Disability Insurance Benefits be affirmed.


Dated: September 10, 2024

Reuben J. Sheperd
United States Magistrate Judge

---

## OBJECTIONS


### Objections, Review, and Appeal

Within 14 days after being served with a copy of this report and recommendation, a party may serve and file specific written objections to the proposed findings and recommendations of the magistrate judge. Rule 72(b)(2), Federal Rules of Civil Procedure; *see also* 28 U.S.C 636(b)(1); Local Rule 72.3(b). Properly asserted objections shall be reviewed de novo by the assigned district judge.


***


Failure to file objection within the specified time may result in the forfeiture or waiver of the right to raise the issue on appeal either to the district judge or in subsequent appeal to the

United States Court of Appeals, depending on how or whether the party responds to the report and recommendations. *Berkshire v. Dahl*, 928 F.3d 520, 530 (6th Cir. 2019). Objections must be specific and not merely indicate a general objection to the entirety of the report and recommendation; "a general objection has the same effect as would a failure to object." *Howard v. Sec'y of Health and Hum. Servs.*, 932 F.2d 505, 509 (6th Cir. 1991). Objections should focus on specific concerns and not merely restate the arguments in briefs submitted to the magistrate judge. "A reexamination of the exact same argument that was presented to the Magistrate Judge without specific objections 'wastes judicial resources rather than saving them, and runs contrary to the purpose of the Magistrates Act." *Overholt v. Green*, No. 1:17-CV-00186, 2018 WL 3018175, 2 (W.D. Ky. June 15, 2018). (quoting *Howard*). The failure to assert specific objections may in rare cases be excused in the interests of justice. *See United States v. Wandashega,* 924 F.3d 868, 878-79 (6th Cir. 2019).